(No. 12995.—Reversed and remanded.)

MARY GENTRY, Admx. Defendant in Error, *vs.* THE CHI-
CAGO AND ALTON RAILROAD COMPANY, Plaintiff in Error.

*Opinion filed February 18, 1920.*

1. NEGLIGENCE—*effect where evidence shows negligence by de-
ceased employee.*  In an action under the Federal Employers' Lia-
bility act for the death of an employee who was acting as pilot on
the rear end of a train which backed into another train standing
on the track, if the evidence shows that the pilot had charge of the
air brake and could have stopped the train if he had not been neg-
ligent, the burden is on the plaintiff to show there was also concur-
rent negligence on the part of some other employee of defendant.

2. SAME—*Supreme Court is bound by finding of trial and Ap-
pellate Courts on question of fact.*  In an action under the Federal
Employers' Liability act, where the question as to whether the em-
ployer was negligent depends on the credibility of a certain witness
who gives evidence tending to prove that fact, a motion to direct
a verdict for the defendant is properly denied, and the Supreme
Court is bound by the finding of the jury and the trial court ac-
cepting the testimony of the witness and by the judgment of the
Appellate Court affirming that of the trial court.

3. SAME—*when attempt to impeach witness by reference to tes-
timony at inquest should be allowed.*  In an action under the Fed-
eral Employers' Liability act for the death of an employee, where
proof of the negligence of the employer depends on the credibil-
ity of one witness, on cross-examination counsel for the defend-
ant should be allowed to attempt to impeach the witness by asking
questions as to the testimony he gave on the same subject at the
coroner's inquest.

4. SAME—*when court may refuse to admit in evidence employ-
ee's application for employment.*  In an action under the Federal
Employers' Liability act for the death of an employee resulting
from a rear-end collision while the employee was acting as pilot
on the rear of the train, it is not error for the court to refuse to

admit in evidence the application of the employee for employment which stated that his eyesight and hearing were good and that he was acquainted with the yards, where there is no dispute as to those matters.

WRIT OF ERROR to the Second Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. JOSEPH B. DAVID, Judge, presiding.

WINSTON, STRAWN & SHAW, (EDWARD WARREN EV-ERETT, of counsel,) for plaintiff in error.

RICE, LOWES, O'NEIL & RICHARDS, (ELBRIDGE W. RICE, of counsel,) for defendant in error.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

John S. Gentry was a switchman employed by the plaintiff in error, the Chicago and Alton Railroad Company, in its railroad yards, which extended from the terminal at the Union station, at Canal and Adams streets, in Chicago, through the city, a distance of several miles, to and including Brighton Park. The yards at Brighton Park extended east and west from one-half to three-fourths of a mile, and trains were made up there and run over the tracks through the yards to the Union station, which was the leaving point when they became passenger trains. Some trains ran with the engine in front, drawing the train, to the Chicago, Burlington and Quincy "Y," at Canal and Sixteenth streets, where they were turned on the "Y" and backed north to the station. Other trains ran backward, pushed by the engine, from Brighton Park to the station. In either case there was a switchman on the rear car for the protection of the train, and if the train was backing up he stood on the platform as a lookout, charged with the control of the train by means of a tail-hose attached to the air line of

the train, which he held and by which he could stop the
train. One of the duties of Gentry, when called upon, was
to act as pilot on trains backing up to the Union station
preparatory to leaving the station on their regular trips.
He was acting as such a pilot in charge of a train when
it ran into the rear of another train running with the en-
gine in front, going to the Union station, and he was killed.
The defendant in error, Mary E. Gentry, as administratrix
of his estate, brought her suit in the superior court of Cook
county under the Federal Employers' Liability act to recover
damages for his death. Upon a trial there was a verdict
finding the defendant guilty and assessing damages at $5000,
with special findings, among which were findings that Gen-
try was guilty of negligence contributing to the injury, and
that the jury had diminished the damages on account of his
negligence fifty per cent. On appeal to the Appellate Court
for the First District the judgment was affirmed, and a writ
of *certiorari* was allowed to bring the record to this court
for review.

At the close of the evidence the defendant moved the
court to direct a verdict of not guilty, and it is urged that
the court erred in denying the motion, because the negli-
gence of Gentry was the sole proximate cause of the acci-
dent and there was no evidence tending to prove defendant
guilty of any negligence. To determine the question so
raised it is necessary to state in a general way the ma-
terial facts which the evidence tended to prove.

Gentry had acted as pilot and was entirely familiar with
the duties of the employment and with the operation of
trains and tracks, switches, signals and everything pertain-
ing to them, and on the evening of the accident he had
piloted train No. 9 from Brighton Park to the Union sta-
tion. Afterward that evening two trains were made up to
be taken to the Union station. Train No. 7 consisted of
empty coaches and seven or eight sleeping cars, and was
due to leave the Brighton Park yards at 9:40 P. M. and

291—28

to run with the engine in front. No. 11 consisted of empty coaches with one sleeping car, and was scheduled to leave at 9:30 P. M. and to back up to the Union station. Train No. 7, headed east, pulled out of the Brighton Park yards at the east end from a lead track which went into the main line west of the Panhandle crossing, which was about four blocks east of the Brighton Park yards. Train No. 11 left Brighton Park yards at the west end, and when it reached the main track, on which it was to back up, a switchman gave notice that through passenger train No. 78, coming from the west, was late, and train No. 11 waited about fifteen minutes until the through train had passed and then ran onto the main track and backed up toward the Union station. Gentry was on the platform of the rear car, which was in front, as the train was pushed by the engine, and had the tail-hose, by which he could control and stop the train. He made the stop at the Panhandle crossing by means of the tail-hose and the train then proceeded east. The through passenger train No. 78, coming from the west, always stopped at Halsted street, which was a regular station, and train No. 7 always stopped at Halsted street to take water, and it was standing there for that purpose when train No. 11 ran into it from the rear, causing the death of Gentry.

There was a slight reversed curve at Halsted street, which means where one curve runs into another without an intermediate tangent, and there was some evidence that Gentry, who could see train No. 7, would not be able to determine, on account of the number of tracks in the curve, with certainty on which track the train stood. Train No. 11 controlled by him was running eighteen or twenty miles an hour and could have been stopped in from 100 to 150 feet by the application of the tail-hose, of which he made no use. A witness for the plaintiff testified that there would be a clear view between the two trains from train No. 7 for more than 500 feet, and if that were so there would be

the same uninterrupted view of train No. 7 at Gentry's position on No. 11.   There was no evidence that Gentry could not determine which track train No. 7 was on within the distance required to stop his train, and if at any time he could not determine which track the other train was on, that fact would not afford an excuse for not controlling his train.   That his negligence was a proximate cause of the accident cannot be doubted, and the other question raised by the motion was whether the defendant was also guilty of negligence concurring with his negligence as a proximate cause.

One ground for charging the defendant with negligence was that the engineer did not put his valve "in lap," which he was to do if Gentry attempted to apply the air by the tail-hose.   The engineer testified that he was sitting on his seat with his hand on the brake valve, expecting any minute to check the air; that he never made a run from Brighton Park to the Union station without stops, and sometimes on a single trip stopped as many as six or seven times, and there was no evidence tending to show that Gentry made an application of the air by the tail-hose and the engineer failed in his duty.   If the engineer was negligent the burden rested on the plaintiff to prove the fact, and there was no evidence tending to prove it.   The fact could not rest on mere conjecture.

The only other ground of negligence charged against the defendant was that the switchman who was pilot on the rear of train No. 7 was not on the rear platform to protect that train from being run into by train No. 11 until after train No. 7 came to a stop.   On that question the porter on train No. 7 testified that in the rear of the sleeper there was a ladies' dressing room, next compartment B and next drawing room A; that he and the switchman acting as pilot were sitting in that compartment and the porter was reading his Bible aloud; that when the train stopped at Halsted street the switchman rushed back to the rear and

just had time to jump off when the collision occurred; that the train was coming to a stop when the switchman rushed out, and he got out in a hurry, and the witness heard him hollering, and the collision took place. There were red and white lights on the rear platform of the rear car, side by side, where it was customary to place lights, but there was a dispute as to whether there was also a large advertising light burning at that place. The evidence for the defendant was that train No. 11 could be seen for about half a mile from the rear of train No. 7, and if the fact was as testified to by the porter there was evidence tending to show negligence on the part of the defendant, because if the switchman had been on the rear platform protecting his train and saw that a collision was likely to occur he might have prevented it. There being some evidence tending to prove negligence of the defendant, the court did not err in denying the motion to direct a verdict.

It is also contended that the special finding that Gentry was guilty of negligence was inconsistent with the general verdict and determines the proposition that his negligence was the sole cause of the accident, because he could only be guilty of negligence by failing to perform some duty; that his only duty was to control the train and to stop it, and if he had stopped it the collision would not have occurred. If the testimony of the porter was true there was the concurrent negligence of both plaintiff and defendant constituting the proximate cause of the accident, and the jury and trial court having accepted the testimony of the porter as true, and the Appellate Court having affirmed the judgment, the fact is conclusively determined so far as this court is concerned.

The whole question of the liability of the defendant rested upon the credibility of the porter and the switchman, respectively. The switchman contradicted the porter, and testified that when he felt the train stopping he got up in the compartment and walked back to the rear platform and

looked down the tracks to see if there was anything com-
ing; that there was nothing in view and he opened the ves-
tibule door and the trap, which is a part of the platform
over the steps; that he then looked again and saw the light
of No. 11, which was then half a mile away; that he picked
up his white and red light and stepped down on the ground
and began swinging his lantern across the track; that he
walked slowly toward train No. 11, swinging his lantern
all the time; that when No. 11 got close enough for Gen-
try to hear, which was 100 or 125 feet or more from him,
he hollered at Gentry to set his air; that he yelled two or
three times to set his air or brakes, and when Gentry did
not act he hollered to him to jump off and hollered at least
three times for him to jump off; that the speed of the train
was not checked or slowed down.  On the cross-examination
of the porter, counsel for the defendant made efforts to
show by the witness that he made different statements at
the coroner's inquest, or if he denied making them, to lay
the foundation for impeachment.  On the trial the porter
testified that as soon as the switchman got out the collision
occurred and that the switchman just had time to jump off,
and he was asked if he did not testify at the coroner's in-
quest that he did not see anything but heard a gentleman
hollering and it was just a short time when the train was
struck, and if he did not say that one minute elapsed be-
tween the time the switchman left the drawing room and
the time the witness heard him begin to holler.  The court
repeatedly asked counsel what difference there was between
the testimony of the porter on the trial and his testimony
at the inquest as stated in the questions, giving the jury to
understand that in his opinion there was no difference.  The
language was not the same, and what the porter meant at
the inquest by a short time, and whether he meant a min-
ute in fact or a moment or an instant, was for the jury.
The defendant had a right that the jury should be informed
as to what the porter said at the inquest, to aid in deter-

mining the vital question whether the switchman did as he testified,—walked down the tracks, swinging his lantern and giving signals at a time when train No. 11 was far enough away to be stopped,—or whether he was negligent and only had time to jump off when the collision occurred. If the switchman's testimony was true, the question whether he was standing on the rear platform when the train stopped was of no importance, because, according to his testimony, warning was given in ample time to stop the other train. The questions were not as to a collateral matter and the condition was such as to call for the fullest inquiry affecting credibility. On the decisive question whether there was any negligence of the defendant, depending on the respective credibility of these two witnesses, the judges of the Appellate Court did not all agree.

It is complained that the court refused to admit in evidence the application of Gentry for employment, in which he stated that his eyesight and hearing were good and that he was acquainted with the conditions in the yards and also stated other matters, but there was no question about his eyesight or hearing, and it was proved and not disputed that he was well acquainted with the yards, the tracks and rules and knew his duty as pilot. Those questions not being in issue there was no error in rejecting the application.

Complaint is also made of instruction No. 1 given at the instance of the plaintiff, which stated the provisions of the Employers' Liability act, and the objection is that it said nothing about assumed risk. But the law on that subject was stated in a volume of instructions advising the jury on every phase of the law.

The judgments of the Appellate Court and superior court are reversed and the cause is remanded to the superior court.                    *Reversed and remanded.*